Slip Op. 19-173

## UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

YAMA RIBBONS AND BOWS CO.,

          Plaintiff,

    v.

UNITED STATES,

          Defendant,

   and

BERWICK OFFRAY LLC,

        Defendant-Intervenor.

</td><td>

**Before: Timothy C. Stanceu, Chief Judge**

**Court No. 18-00054**

</td></tr>
</table>

## OPINION AND ORDER

[Ordering remand of a final agency determination in a countervailing duty proceeding on narrow woven ribbons with woven selvedge from the People's Republic of China]

Dated:  December 30, 2019

*John J. Kenkel*, deKieffer & Horgan, PLLC, of Washington, D.C., for plaintiff Yama Ribbons and Bows Co.  With him on the brief were *Alexandra H. Salzman*, *Judith L. Holdsworth*, and *J. Kevin Horgan*.

*Kara M. Westercamp*, Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant.  With her on the brief were *Joseph H. Hunt*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director.  Of counsel on the brief was *Paul Keith*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

*Gregory C. Dorris*, Pepper Hamilton LLP, of Washington D.C., for defendant-intervenor Berwick Offray LLC.

Stanceu, Chief Judge:  In this action, plaintiff Yama Ribbons and Bows Co. ("Yama")

contests an administrative determination the International Trade Administration, U.S.

Department of Commerce ("Commerce" or the "Department") issued to conclude a periodic

review of a countervailing duty ("CVD") order on narrow woven ribbons with woven selvedge

from the People's Republic of China ("China" or the "PRC").  Ruling that the determination is

contrary to law in certain respects, the court remands the determination to Commerce for

appropriate corrective action.

## I. BACKGROUND

### A. The Contested Determination

The contested determination (the "Final Results") is *Narrow Woven Ribbons With

Woven Selvedge From the People's Republic of China:  Final Results of Countervailing Duty

Administrative Review; 2015*, 83 Fed. Reg. 11,177 (Int'l Trade Admin. Mar. 14, 2018) ("*Final

Results*").  The Final Results incorporated by reference an explanatory document.  Decision

Memorandum for the Final Results of 2015 Countervailing Duty Administrative Review:

Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China (Int'l

Trade Admin. Mar. 8, 2018) (P.R. Doc. 101, J.App. at 16)[1] ("Final Decision Mem.").

### B. The Administrative Review, Preliminary Results, and Final Results

Commerce issued a countervailing duty order (the "Order") on narrow woven ribbons

with woven selvedge from China (the "subject merchandise") in 2010.  *Narrow Woven Ribbons

With Woven Selvedge From the People's Republic of China:  Countervailing Duty Order*,

---

[1] This Opinion and Order discloses only information included in public versions of
record documents and information subsequently made public in the Preliminary Decision
Memorandum, the Final Decision Memorandum, or the public versions of the parties' filings.
Therefore, solely citations to the public versions of record documents are provided.  All
citations to the "J.App" are to the Joint Appendix Public Version (Dec. 26, 2018), ECF No. 33.

75 Fed. Reg. 53,642 (Int'l Trade Admin. Sept. 1, 2010) ("*Order*").[2]  Commerce initiated the

review at issue, the fifth periodic review of the Order, on November 9, 2016 upon the request of

Berwick Offray LLC ("Berwick Offray"), the petitioner in the countervailing duty investigation

and the defendant-intervenor in the present action.  *Initiation of Antidumping and*

*Countervailing Duty Administrative Reviews*, 81 Fed. Reg. 78,778 (Int'l Trade Admin. Nov. 9,

2016).  The review pertained to entries of subject merchandise made during the period of review

("POR") of January 1, 2015 through December 31, 2015.  *Id.* at 78,788.  Commerce identified

Yama as the sole exporter or producer of the subject merchandise to be reviewed.  *Id.*

      Commerce published the preliminary results of the review on September 7, 2017.

*Narrow Woven Ribbons With Woven Selvedge From the People's Republic of China:*

*Preliminary Results of Countervailing Duty Administrative Review; 2015*, 82 Fed. Reg. 42,296

(Int'l Trade Admin. Sept. 7, 2017) ("*Preliminary Results*").  Commerce preliminarily assigned

Yama a total net countervailable duty subsidy rate of 23.37%.  *Id.* at 42,297.  Commerce

incorporated by reference a decision memorandum for the preliminary results.  Decision

Memorandum for Preliminary Results of 2015 Countervailing Duty Administrative Review:

Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China (Int'l

Trade Admin. Aug. 30, 2017) (P.R. Doc. 68, J.App. at 48) ("Preliminary Decision Mem.").

---

[2] The countervailing duty order applies generally to woven ribbons 12 centimeters or
less in width, and of any length, that are composed in whole or in part of man-made fibers and
that have woven selvedge.  Some exclusions apply.  *Narrow Woven Ribbons With Woven*
*Selvedge From the People's Republic of China:  Countervailing Duty Order*, 75 Fed. Reg.
53,642, 53,642-43 (Int'l Trade Admin. Sept. 1, 2010).  The term "selvedge"
refers to "the edge on either side of a woven or flat-knitted fabric so fashioned as to prevent
raveling."  *Salvage or selvedge*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY,
UNABRIDGED (2002).

In the Final Results, Commerce assigned Yama a total net countervailable duty subsidy

rate of 23.37%, unchanged from the Preliminary Results.  *Final Results*, 83 Fed. Reg. at 11,177.

### C. Proceedings in the Court of International Trade

Yama instituted this action in March 2018.  Compl. (Mar. 20, 2018), ECF No. 4.  Before

the court is Yama's motion for judgment on the agency record, brought under USCIT Rule 56.2.

Pl. Yama's Mot. for J. upon the Agency R. (July 30, 2018), ECF No. 23 ("Pl.'s Br.").  Yama's

motion is opposed by defendant United States, Def.'s Resp. in Opp'n to Pl.'s Mot. for J. upon

the Agency R. (Nov. 9, 2018), ECF No. 29 ("Def.'s Br."), and by defendant-intervenor Berwick

Offray.  Def.-Int. Berwick Offray's Resp. in Opp'n to Pl.'s Mot. for J. on the Agency R.

(Nov. 9, 2018), ECF No. 28 ("Def.-Int.'s Br.").  The court held oral argument on Yama's

motion on May 23, 2019.  Oral Argument (May 23, 2019), ECF No. 35.

## II.  DISCUSSION

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction according to section 201 of the Customs Courts Act of

1980, 28 U.S.C. § 1581(c),[3] pursuant to which the court reviews actions commenced under

section 516A of the Tariff Act of 1930, *as amended* ("Tariff Act"), 19 U.S.C. § 1516a,

including an action contesting a final determination that Commerce issues to conclude an

administrative review of a countervailing duty order.  *See* 19 U.S.C. § 1516a(a)(2)(B)(iii).  In

reviewing a final determination, the court "shall hold unlawful any determination, finding, or

conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not

---

[3] Citations to the United States Code are to the 2012 edition.

in accordance with law." 19 U.S.C. § 1516a(b)(1).  Substantial evidence refers to "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *SKF*

*USA, Inc. v. United States*, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting *Consol. Edison Co. v.*

*NLRB*, 305 U.S. 197, 229 (1938)).

### B. Countervailing Duties under the Tariff Act

Section 701(a) of the Tariff Act directs generally that Commerce is to impose a

countervailing duty if:  (1) Commerce determines that the government of a country, or any

public entity within that country, "is providing, directly or indirectly, a countervailable subsidy

with respect to the manufacture, production, or export of a class or kind of merchandise

imported, or sold (or likely to be sold) for importation, into the United States"; and (2) the U.S.

International Trade Commission determines that an industry in the United States is materially

injured or threatened with material injury by reason of the subsidized imports.  19 U.S.C.

§ 1671(a).  A "countervailable subsidy" exists, generally, where a governmental authority

provides a financial contribution to a person and a benefit is thereby conferred, and the subsidy

meets the requirement of "specificity" as set forth in the statute.  19 U.S.C. § 1677(5), (5A).

### C. The Export Buyer's Credit Program

In the Final Results, Commerce attributed to Yama participation in numerous

governmental programs and assigned individual subsidy rates ("program rates") for each one,

resulting in the overall subsidy rate of 23.37%.  *See* Final Decision Mem., J.App. at 21-22.  Of

the program rates, the highest one included in Yama's 23.37% subsidy rate was 10.54%, which

Commerce attributed to Yama in relation to China's "Export Buyer's Credit Program" (to

which it also refers as the "EXIM Buyer's Credits Program" and the "EXIM Bank Credit

Program") ("EBCP"), an export-promoting loan program administered by the Export-Import Bank of China ("EX-IM Bank").[4]  *Id.* at 21.

When subsidization takes the form of a government loan, a "benefit" is conferred "if there is a difference between the amount the recipient of the loan pays on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market."  19 U.S.C. § 1677(5)(E)(ii).

In its Rule 56.2 motion, Yama argues that the record does not contain evidence that either Yama or its customers used the EBCP and thereby obtained a benefit, that Commerce unlawfully disregarded record evidence that Yama and its customers were *not* users of the program, and that the Department's attributing use of the EBCP to Yama therefore was contrary to law.  Pl.'s Br. 10-27.  Yama also argues that Commerce applied a rate based on "facts otherwise available" and an "adverse inference" without an adequate basis in the record.  *Id.* at 10-11, 27-35.  In the alternative, Yama challenges as unreasonable and punitive, and as unsupported by record evidence, the Department's assigning a program rate of 10.54% for the EBCP in determining Yama's overall subsidy rate.  *Id.* at 35-39.

---

[4] The second-highest program rate, 9.52% *ad valorem*, was for the provision of synthetic yarn to Yama for less than adequate remuneration.  Decision Memorandum for the Final Results of 2015 Countervailing Duty Administrative Review:  Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China (Int'l Trade Admin. Mar. 8, 2018) (P.R. Doc. 101, J.App. at 21).  The remaining program rates were considerably smaller than those for the Export Buyer's Credit Program ("EBCP") and synthetic yarn.  *See id.*

D. The Department's Decision to Include the EBCP Program in Determining Yama's Overall Subsidy Rate and the Stated Rationale

The Tariff Act provides for imposition of a countervailing duty only if a benefit is "conferred" upon a person as a result of a financial contribution. 19 U.S.C. § 1677(5)(B). Here, Commerce imposed a countervailing duty on exports of Yama's merchandise without reaching a finding of fact that a benefit from the EBCP actually was conferred upon Yama through participation in the EBCP by Yama or its customers. Instead, as discussed below in this Opinion and Order, Commerce inferred participation in the EBCP, and the conferring of a benefit therefrom, as "facts otherwise available" with an "adverse inference," invoking its authority under 19 U.S.C. § 1677e, subsections (a) and (b), respectively. When invoking both provisions, Commerce refers to its use of subsections (a) and (b) together as "adverse facts available," or "AFA." For the Final Results, Commerce concluded that "consistent with our practice, where the GOC [i.e., the government of China] withheld necessary information and failed to cooperate by not acting to the best of its ability to comply with our requests for information, Commerce applied AFA to the GOC by finding that: . . . the export buyer's credits program constitutes a financial contribution and is specific." Final Decision Mem., J.App. at 32.

Commerce presented its reasoning for resorting to "facts otherwise available" in the Preliminary and the Final Decision Memoranda. In both, Commerce declined to decide whether the record evidence did or did not support a finding that Yama used or benefitted from the EBCP. Instead, the Department's approach was to decide that the record evidence did *not* allow it to find that Yama did *not* use or benefit from the program: "As explained in the *Preliminary*

*Results*, we continue to find that the information on the record does not support Commerce finding that Yama did not use the export buyer's credit program during the POR."  Final Decision Mem., J.App. at 29.  According to Commerce, "[a]s we noted in the *Preliminary Results*, the GOC has not provided the requested information and documentation necessary for Commerce to develop a complete understanding of this [Export Buyer's Credit] program (*i.e.*, the Standard Questions Appendix, information pertaining to the 2013 revision to the program, and the use of third-party banks to disburse/settle export buyer's credits)."  *Id.* at 30. Commerce added that "[s]uch information is critical to understanding how export buyer's credits flow to and from foreign buyers and the EXIM Bank of China.  Absent the requested information, we are unable to rely on the GOC's and Yama's claims of non-use of this program."  *Id.*

The "requested information" that Commerce identified as missing is in three categories: (1) responses to the "Standard Questions Appendix"; (2) information concerning a 2013 revision to the EBCP that, according to Commerce, eliminated a requirement that participation in the program requires that the contract amount be more than two million U.S. dollars; and (3) a list of third-party banks involved in the disbursement/settlement of export buyer's credits. Preliminary Decision Mem., J.App. at 57-58; Final Decision Mem., J.App. at 30.

Commerce stated, further, that "we requested the information a second time in a supplemental questionnaire, to which the GOC in many instances chose not to provide specific information requested about this program."  Final Decision Mem., J.App. at 30.  Commerce added that "we continue to find that the GOC withheld necessary information that was requested of it, and thus, Commerce must continue to rely on facts otherwise available in these

final results, pursuant to section 776(a)(2)(A) and 2(C) of the Act."  *Id.*  Section 776(a)(2)(A),

19 U.S.C. § 1677e(a)(2)(A), which directs the use of "facts otherwise available," applies if "an

interested party or any other person withholds information that has been requested" by

Commerce "under this subtitle."  Section 776(a)(2)(C), 19 U.S.C. § 1677e(a)(2)(C), applies "if

an interested party or any other person … significantly impedes a proceeding under this

subtitle."[5]  Thus, Commerce found that the Chinese government withheld information

Commerce requested and significantly impeded the review.  Commerce found, further, that

China failed to act to the best of its ability in responding to the Department's requests for

information and on that basis invoked its "adverse inference" authority under 19 U.S.C.

§ 1677e(b).  Under that provision, if Commerce "finds that an interested party has failed to

cooperate," Commerce, "in reaching the applicable determination under this subtitle . . . may

use an inference that is adverse to the interests of that party in selecting from among the facts

otherwise available."  19 U.S.C. § 1677e(b).

      Commerce acknowledged in its decision that it had found the Chinese government,

rather than Yama, to be the party it considered to have failed to cooperate in responding to

requests for information.  Commerce reasoned that "the foreign government is in the best

position to provide information regarding financial contribution and benefit."  Final Decision

_____

      [5] The Tariff Act provides generally that Commerce is to use "facts otherwise available" if "necessary information is not available on the record," 19 U.S.C. § 1677e(a)(1), or if "an interested party or any other person—(A) withholds information that has been requested by the administering authority [i.e., Commerce] or the Commission under this subtitle, (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested . . . (C) significantly impedes a proceeding under this subtitle, or (D) provides such information but the information cannot be verified as provided in section 1677m(i) of this title [concerning the verification process]." 19 U.S.C. § 1677e(a)(2).

Mem., J.App. at 32.  Commerce added that "[o]bviously, this has an effect on the respondent

company [i.e., Yama], but this does not mean that Commerce's application of AFA was

unlawful." *Id.*  Notably, Commerce added that "*[t]he respondent company has the opportunity*

*to demonstrate that it did not use, or benefit from, the program at issue.*" *Id.* (emphasis added).

<u>E. Commerce Failed to Provide Yama a Meaningful Opportunity to Demonstrate That It Did
Not Benefit from the EBCP and Wrongly Concluded It Lacked the Information to Make the
"Benefit" Determination</u>

Yama's primary claim in this litigation is that Commerce acted unlawfully in including

the EBCP program rate in the overall subsidy rate it determined for Yama, based on facts

otherwise available and an adverse inference stemming from the Department's finding that the

government of China was a noncooperating party.  As the court explains in this Opinion and

Order, the Department's action was not lawful.[6]

Commerce must tread carefully when its use of an adverse inference would injure a

party such as Yama, which Commerce did not find to have failed to cooperate in responding to

the Department's requests for information.  *See Changzhou Trina Solar Energy Co. v. United

States*, 42 CIT __, __, 352 F. Supp. 3d 1316, 1325 (2018) ("*Changzhou II*") ("Commerce may

apply AFA even if the collateral effect is to 'adversely impact a cooperating party.' . . .

Commerce, however, should 'seek to avoid such impact if relevant information exists elsewhere

on the record.'" (quoting *Archer Daniels Midland Co. v. United States*, 37 CIT __, __, 917 F.

Supp. 2d 1331, 1342 (2013))).  Commerce did not seek to avoid the adverse impact despite the

---

[6] Because the court concludes, on Yama's primary claim, that the Department's use of
its "AFA" authority was unlawful in this case, it does not reach Yama's claim in the alternative
that it was unreasonable and punitive that the Department assigned, as an adverse inference, a
program rate of 10.54% for the EBCP in determining Yama's overall subsidy rate.

existence elsewhere on the record of information relevant to, and indeed highly probative on, the question of whether Yama benefitted from the EBCP.

As explained below, Commerce asserted that it offered Yama an opportunity to demonstrate that it did not use or benefit from the EBCP, but Commerce deprived Yama of any real opportunity to do so. While purporting to offer Yama that opportunity, Commerce resorted to fact otherwise available, and applied an adverse inference, based on findings of fact that lacked substantial evidence on the record of the review.

Had Commerce actually provided Yama the opportunity to demonstrate the lack of a benefit, it necessarily would have considered the evidence of record that Yama *did not* use or benefit from the EBCP in light of any evidence that Yama *did* use or benefit from it. While the record contained evidence of the former, there was no evidence of the latter. Instead of addressing the record evidence specifically, Commerce disregarded it upon a vague claim that, due to the Chinese government's failure to submit the three identified categories of requested information on the EBCP, it lacked "a complete and reliable understanding" of the program. Final Decision Mem., J.App. at 31. In this way, Commerce relied on a finding that its lack of understanding of the EBCP resulting from the Chinese government's alleged failure to provide the three identified categories of information prevented it from making the determination of whether Yama benefitted from the program. That finding is not supported by the record evidence.

While stating that it considered the record information relevant to the question of whether Yama benefitted from the EBCP, Commerce stated at the same time that it could not rely on any of it, brushing that evidence aside with the following statement:

> Commerce has considered all information on the record of this proceeding, including the statements of non-use provided by Yama; however, as explained above and in the *Preliminary Results*, we are unable to rely on information provided by Yama due to Commerce's lack of sufficient information to provide a complete and reliable understanding of the program.

Final Decision Mem., J.App. at 31. This conclusory statement misconstrues the determination the statute required the Department to make. Commerce was empowered to impose a countervailing duty to redress the EBCP only if it found that a financial contribution was provided "to a person," (i.e., Yama) "and a benefit [was] thereby conferred." 19 U.S.C. § 1677(5)(B). Instead of doing that, Commerce placed Yama in the position of proving a negative: "we continue to find that the information on the record does *not* support Commerce finding that Yama did *not* use the export buyer's credit program during the POR," Final Decision Mem., J.App. at 29 (emphasis added), and declined to consider the record evidence Yama produced in its endeavor to prove its non-use of the EBCP. Commerce appears to have lost sight of the issue, which was not whether Commerce had a "complete and reliable understanding of the program," *id.* at 31, but whether Yama did, or did not, use or benefit from that program.

The three categories of information Commerce identified as missing do not justify the Department's failure to make the "benefit" determination the statute required. In summary, the information requested in the Standard Questions Appendix that pertained to the question of whether Yama benefitted from the program was present on the record. As to the 2013 program revision, the record contained conflicting information on the question of whether the $2 million threshold was in effect. *Compare* Dep't Commerce Mem., "Administrative Review of Countervailing Duty Order on Citric and Certain Citrate Salts; Verification of the Questionnaire

Responses Submitted by the Government of the People's Republic of China" (Int'l Trade

Admin. Oct. 7, 2014) (P.R. Doc. 74, J.App. at 511) ("Salts Verification Mem.") *with* Gov't of

China Supplemental New Subsidy Allegations Questionnaire Response (May 12, 2017) (P.R.

Docs. 41-48, J.App. at 270) ("China Supplemental NSA Response").  But neither the record nor

the Department's explanations in its decision memoranda establish any specific relevance of

that question to the issue before Commerce, which was whether Yama benefitted from the

EBCP.  The third category of information Commerce identified as missing, about "the use of

third-party banks to disburse/settle export buyer's credits," Final Decision Mem., J.App. at 30,

also fails as a basis for the Department's determination.  Through the Chinese government's

response, the Department was informed that only the EX-IM Bank was involved in

"disbursement" of EBCP credits, and Commerce did not find that the record contained

information contradicting this statement.  In its NSA questionnaires, Commerce did not ask the

government of China for a list of banks involved in the "*settlement*" (as opposed to the

disbursement) of EBCP credits, although in the Final Decision Memorandum Commerce

presumed that it had.  *See* Supplemental New Subsidy Allegations Questionnaire to the

Government of China (Apr. 28, 2017) (P.R. Doc. 39, J.App. at 246) ("Supplemental NSA

Questionnaire to China") ("Provide a list of all partner/correspondent banks involved in

*disbursement* of funds under the Export Buyer's Credit Program" (emphasis added)).

1. The Record Contained Considerable Evidence that Yama Did Not Use or Benefit from the
EBCP but Contained No Evidence to the Contrary

Included in Yama's record are the responses to the Department's request that Yama

provide (1) a list of customers to which Yama exported subject merchandise during the POR;

(2) an explanation of the role Yama played in assisting its customers to obtain export buyer

credits; and (3) if Yama claimed that none of its customers used buyer credits during the POR, a

detailed explanation of the steps Yama took to make this determination.  Dep't Commerce

Letter to Yama re: New Subsidy Allegations (Mar. 3, 2017) (P.R. Doc. 34, J.App. at 209)

("NSA Questionnaire to Yama").

      Yama provided a list of its export customers during the POR.  Yama New Subsidy

Allegations Questionnaire Response (Mar. 17, 2017) (P.R. Doc. 37, J.App. at 233-34, 242)

("Yama NSA Response") (referring to an "Exhibit NSA-1" submitted to Commerce with its

response (but absent from the public joint appendix submitted to the court) containing a list of

Yama's export customers, 83 in number, during the POR).

      Yama responded as follows to the inquiry about the role Yama played in assisting its

customers to obtain buyer credits:  "Not applicable.  Yama did not provide any assistance to its

customers in obtaining buyer credits.  Further, none of Yama's export customers had obtained

or had tried to obtain buyer credits from EXIM Bank of the PRC during POR."  *Id.* at 233-34.

As to the steps Yama took to make the determination of non-use, Yama's response stated that

"Yama contacted all its export customers, as listed in Exhibit NSA-1, and confirmed no

customers had obtained buyers' credit from China Ex-Im Bank in the POR."  *Id.* at 234.

      Also included in the record is the statement by the government of China that "[a]fter

consultation with EX-IM Bank and Yama, the GOC confirms that none of the U.S. customers of

Yama used the Export Buyer's Credits from EX-IM Bank during the POR."  China

Supplemental NSA Response, J.App. at 270.  Responding to the Department's question of the

steps taken to determine whether there was use of the program, the GOC stated the following:

> The GOC had obtained list of Yama'[*sic*] US export customers., [*sic*] which then was provide [*sic*] to EX-IM Bank.  EX-IM Bank then searched in its own systems each of customers identified on the list.  The search results indicate that none of the customers had balances for export buyer's credits during the POR.  Thus GOC confirms this program was not used by these customers during the POR.

*Id.* at 272.  On this record, Commerce was not free to ignore record evidence that Yama did not benefit from the EBCP.[7]

### 2. Commerce Impermissibly Inferred Yama's Participation in the EBCP from the Manner in which the Government of China Responded to Questionnaires

Commerce sent the Chinese government the "Initial Questionnaire" for the administrative review on December 5, 2016.  Dep't Commerce Initial Questionnaire (Dec. 5, 2016) (P.R. Doc. 7, J.App. at 81-137) ("Initial Questionnaire").  This questionnaire did not specifically mention the EBCP.  Rather, it contained a section titled "programs not used or provided [*sic*] no measurable benefits," which set out seventeen different programs and instructed the GOC to "please answer all questions in the ***Standard Questions Appendix and any other applicable appendices*** of this section" for each program used by any company during the POR.  *Id.* at 104-05 (emphasis in original).  The questionnaire instructed, further, that "[i]f

---

[7] In recent decisions, this Court has rejected, or otherwise declined to sustain, the Department's application of a methodology similar to that used here.  *Guizhou Tyre Co. v. United States*, 42 CIT __, 348 F. Supp. 3d 1261 (2018) ("*Guizhou I*"); *Changzhou Trina Solar Energy Co. v. United States*, 42 CIT __, 352 F. Supp. 3d 1316 (2018) ("*Changzhou II*"); *Changzhou Trina Solar Energy Co. v. United States*, 42 CIT __, 352 F. Supp. 3d 1316 (Nov. 30, 2018) ("*Changzhou III*"); *Guizhou Tyre Co. v. United States*, 43 CIT __, 389 F. Supp. 3d 1315 (May 15, 2019) ("*Guizhou II*"); *Guizhou Tyre Co. v. United States*, 43 CIT __, 399 F. Supp. 3d 1346 (Aug. 21, 2019) ("*Guizhou III*"); *Changzhou Trina Solar Energy Co. v. United States*, 43 CIT __, 2019 WL 5856438 (Nov. 8, 2019) ("*Changzhou IV*"); *Changzhou Trina Solar Energy Co. v. United States*, 43 CIT __, 2019 WL 6124908 (Nov. 18, 2019) ("*Changzhou V*"); *Guizhou Tyre Co. v. United States,* 43 CIT __, 2019 WL 6718926 (Dec. 10, 2019) ("*Guizhou IV*").

no respondent company used a program during the stated time period, please so state; you need

not provide a response to the appendices for the program." *Id.* at 105.  In accordance with the

instructions contained in the questionnaire, *id.* at 87-88, the government of China forwarded

Section III of the questionnaire to Yama, which submitted a response and supporting exhibits.

Yama Affiliated Company Questionnaire Response (Dec. 20, 2016) (P.R. Doc. 12, J.App. at

139); Yama Section III Questionnaire Response (Jan. 19, 2017) (P.R. Docs. 16-19, J.App. at

151) (containing exhibits).  Yama's response did not mention the EBCP.  *Id.*

The government of China failed to submit a questionnaire response by the due date of

January 11, 2017 and on January 25, 2017 requested an extension until February 20, 2017,

which Commerce denied on February 7, 2017.  Dep't Commerce Mem. re: Initial Questionnaire

(Feb. 7, 2017) (P.R. Doc. 28, J.App. at 170, 172).  But as discussed below, the failure of the

government of China to submit a timely response did not justify the Department's inferring a

benefit to Yama from the EBCP as facts otherwise available with an adverse inference.

On February 7, 2017, defendant-intervenor Berwick Offray submitted a "new subsidy

allegation" identifying several subsidy programs from which, it argued, Yama benefitted during

the POR, among them the EBCP.  Berwick New Subsidy Allegation (Feb. 7, 2017) (P.R.

Docs. 20-27, J.App. at 154); *see also id.* at 160 ("[T]he Department has initiated an

investigation into this program [i.e., the EBCP] and has found it countervailable in many cases"

and "should do so here.").  According to this submission, the Export Import Bank of China

provided "export-contingent loans at preferential rates" during the POR for certain products,

including textiles.  *Id.* at 158.

Commerce proceeded to investigate the new subsidy allegation, including Yama's alleged use of the EBCP.  Dep't Commerce Mem. re: New Subsidy Allegations (Mar. 2, 2017) (P.R. Doc. 30, J.App. at 175).  Commerce sent the Chinese government and Yama additional questionnaires ("new subsidy allegations" ("NSA") questionnaires).

In the Final Decision Memorandum, Commerce found that the Chinese government did not provide certain information Commerce requested in the Standard Questions Appendix and that this information was necessary to evaluating "the GOC's and Yama's claims of non-use of this program."  Final Decision Mem., J.App. at 30.  This finding was not supported by substantial evidence on the record.

The first NSA questionnaire issued to the Chinese government, dated March 3, 2017, instructed it to "[a]nswer all questions in the following appendices for this program: *Standard Questions Appendix.*"  Dep't Commerce Letter to Gov't of China re: New Subsidy Allegations (Mar. 3, 2017) (P.R. Doc. 33, J.App. at 186) ("First NSA Questionnaire").  The Standard Questions Appendix is not specific to the EBCP or any other program.  It contains letter-designated questions "A" through "M," many of which contained sub-parts with additional questions.  *See id.* at 194-198 (Standard Questions Appendix).  Question A sought "a description of the program including the purpose of the program and the date it was established."  *Id.* at 194.  Question B asked for the names and addresses of the government agencies or authorities responsible for administering the program.  *Id.*  Information responsive to both questions is on the record of the review, provided in the government of China's response to the second NSA questionnaire, as discussed below.  Because there is no evidence on the record that Yama benefitted from the EBCP (and there is evidence that it did not), the record

evidence does not establish any relevance of questions C through M of the Standard Questions Appendix.[8]

      In its response to the first NSA questionnaire, the government of China stated that the Department's questions regarding the EBCP were "[n]ot applicable," as "Yama confirms none of its customers have used this program.  Please refer to Yama's response."  Gov't of China New Subsidy Allegations Response (Mar. 17, 2017) (P.R. Docs. 35-36, J.App. at 219) ("China NSA Response").  This questionnaire, after directing the Chinese government to answer the questions in the Standard Questions Appendix, listed seven specific requests for information, qualified by introductory instructions limiting the requests to information "regarding Export Buyer's Credits provided to **all U.S. customers** of the respondent (including all responding cross-owned affiliated companies) during the POR."  First NSA Questionnaire, J.App. at 186 (emphasis in original).  The instructions repeated this limitation, requesting the information "regarding all buyer credits provided to the respon[d]ent's customers."  *Id.* (emphasis in original).  Therefore, the response from the government of China to the first NSA questionnaire was not a failure to cooperate unless, contrary to the Chinese government's response,

---

[8] The instructions for Question C of the Appendix provided as follows:

> If none of these companies [i.e., the companies under review] applied for, received, claimed, accrued or used assistance under this program during the period designated [i.e., the period of review], *you need not reply to all of the remaining questions in this Appendix*.

Dep't Commerce Letter to Gov't of China re: New Subsidy Allegations (Mar. 3, 2017) (P.R. Doc. 33, J.App. at 194) (emphasis added).  While the Department's NSA Questionnaire to China contained a general directive to "answer all questions" in the Standard Questions Appendix, the specific exception to this general directive, which appeared in Question C, can be read to apply in this instance.

Commerce permissibly could find that any EBCP credits to Yama's customers actually were provided during the POR. This, however, is not the case, for the record contains no evidence that there were any such credits and considerable evidence that there were not. Nevertheless, in a supplemental NSA questionnaire, dated April 28, 2017, that Commerce sent to the Chinese government, Commerce told the government of China that in the government's March 17, 2017 response to the first NSA questionnaire it found "*deficiencies, omissions*, and areas where further clarification is needed." Supplemental NSA Questionnaire to China, J.App. at 244 (emphasis added). As to "deficiencies and omissions," and any alleged failure of the Chinese government to cooperate stemming from the first NSA questionnaire, the Department's findings were unsupported by the record. The record suggests that Commerce misinterpreted its own questionnaire instructions, overlooking the qualifying introductory words quoted above.

The Chinese government's response to the April 28, 2017 supplemental NSA questionnaire, dated May 12, 2017, provided a detailed discussion of the operation of the EBCP as administered by the EX-IM Bank. China Supplemental NSA Response, J.App. at 270-272. Because of this record evidence, and the aforementioned misinterpretation by Commerce of its own questionnaire, the court cannot sustain the Department's finding that a failure by the government of China to respond to questions in the Standard Questions Appendix (or subsequent questions related to it) prevented Commerce from determining whether Yama or its customers benefitted from the Export Buyer's Credit Program during the POR.

### 3. The Record Does Not Demonstrate the Specific Relevance of the $2 Million Contract Threshold to the Question of Whether Yama Benefitted from the EBCP

The court also is unable to sustain the Department's finding that information Commerce said to be missing from the record concerning a 2013 revision to the EBCP, which it alleges the government of China failed to provide, prevented it from determining whether Yama used or benefitted from the program. As to the relevance of the 2013 revision, Commerce maintained that this revision eliminated an EBCP requirement that participation in the program requires that the contract amount on which a loan is sought be more than $2 million in U.S. dollars. *See* Preliminary Decision Mem., J.App. at 57. Commerce stated that it had placed on the record "[i]nformation obtained in a prior CVD proceeding" indicating the elimination of the requirement. *Id.*

In its May 12, 2017 response to the Department's supplemental NSA questionnaire, the Chinese government stated that the contract amount must be more than 2 million U.S. dollars, that this requirement could not be satisfied by combining invoices of lesser amounts, that the EX-IM Bank had confirmed this requirement, and that it had attached to its response "Article 5 of the Administrative Measures of Export Buyer's Credit of EIBC ('Administrative Measures')," in which the requirement is set forth. China Supplemental NSA Response, J.App. at 270.

Commerce added to the record two submissions from prior proceedings. The first was a Commerce verification report, dated October 7, 2014, of a questionnaire response of the Chinese government in an administrative review of a countervailing duty order on citric acids and citrate salts from China. Salts Verification Mem., J.App. at 511-17. The report describes a

meeting between Department officials with EX-IM Bank officials and states as follows: "One of the conditions [of the EBCP] prior to and during the POR was that sales contracts have to be a minimum of US$ 2 million. EXIM officials indicated the *Administrative Measures* was revised in 2013 and eliminated the contract minimum." *Id.* at 512.

The second submission added to the record is the "Government of China 7th Supplemental Response" in an administrative review of a countervailing duty order on certain amorphous silica fabric from China, dated September 6, 2016. Letter from Perkins Coie, "Government of China 7th Supplemental Response" (Sept. 6, 2016) (P.R. Doc. 74, J.App. at 519-29) ("China Silica Fabric Response"). The only reference in this document suggesting that the $2 million contract threshold was eliminated in 2013 is in the Department's first question. That question refers to an earlier questionnaire response in that proceeding, in which the Chinese government mentioned that the $2 million requirement was in effect. Commerce asked for a clarification of the "discrepancy" with other information in the Department's possession, which possibly is a reference to the verification report discussed above. The government of China's response refers Commerce to the "*2000 Rules Governing Export Buyers' Credit* (also referred to as '*Administrative Measures*') , in which the US$2 million threshold requirement appeared for the first time." *Id.* at 525-26. The response also states that *Administrative Measures* "remain in effect" and "were not repealed or replaced in 2013" by guidelines issued in 2013, which the Chinese government described as "internal to the bank, non-public, and not available for release." *Id.* at 526.

The only record evidence that the $2 million threshold was discontinued in 2013 is the Department's statement in its verification report on the review on citric acid and citric salts and

the apparently related reference to it in the questionnaire mentioned above.  All other record

evidence, including both of the Chinese government's responses in the amorphous silica fabric

review and in this review, indicates that the requirement remained in effect.  But even if it is

presumed that the elimination of the requirement actually occurred in 2013 (for which there is

less than substantial evidence on this record), such a presumption would not establish that Yama

benefitted from the EBCP.

It might be inferred generally that the $2 million loan threshold, if applied to U.S.

customers, would make participation of any customer less likely.  But in this case, the record

evidence does not establish any specific relevance of the $2 million loan threshold, or the

possible discontinuance thereof in 2013, to the question of whether Yama or its customers used

the EBCP.  Commerce failed to demonstrate the significance of that question to its inquiry on

the record before it, which contained evidence that Yama did not benefit from the EBCP and

lacked evidence to the contrary.  Commerce, therefore, erred in treating the issue of whether

that threshold was in effect during the POR as a justification for its attributing a benefit from the

EBCP to Yama as an adverse inference.[9]

---

[9]  Defendant-intervenor unpersuasively argues that "[t]his same AFA determination
following the 2013 changes to the EBC Program was upheld by the Court in *RZBC Grp.
Shareholding Co. v. United States*, 222 F. Supp. 3d 1196, 1200-03 (Ct. Int'l Trade 2017)."
Def.-Int. Berwick Offray's Resp. in Opp'n to Pl.'s Mot. for J. on the Agency R. (Nov. 9, 2018),
ECF No. 28, 10.  The court disagrees that it is "the same AFA determination."  *RBZC Grp.*
involved facts not present on this record here, including rejection of a proffered translation of
*Administrative Measures* as untimely new information.  In support of the same argument,
defendant-intervenor relies upon *Changzhou Trina Solar Energy Co. v. United States*, 40 CIT
__, __, 195 F. Supp. 3d 1334, 1354-55 (2016) ("*Changzhou I*").  This decision also is
inapposite, as it involved a refusal by the government of China to allow access to records during
the verification procedure that related to the question of a customer's possible use of the EBCP.

 4. Commerce Never Requested Information on Third-Party Banks Involved in the "Settlement"
of Export Buyer's Credits, and the Finding of Noncooperation as to this Request is Unsupported

        The third category of information Commerce claimed to need, and claimed the Chinese

government failed to provide, was information on "the use of third-party banks to disperse/settle

export buyer's credits."  Final Decision Mem., J.App. at 30.  The record does not support a

finding that the Chinese government failed to answer the inquiry regarding disbursement of

credits.  The government of China clarified that no bank other than the EX-IM Bank disbursed

credits under the EBCP and provided a detailed discussion of the process.  The record also

reveals that Commerce, contrary to its finding of noncooperation, never requested from the

government of China information on the settlement of EBCP credits.

        In its first NSA questionnaire, Commerce asked the government of China to "[p]rovide a

list of all partner/correspondent banks involved in disbursement of funds under the Export

Buyer's Credit Program."  First NSA Questionnaire, J.App. at 187.  However, as the court

discussed above, this request for information was limited by the instructions on the previous

page of that questionnaire, which specified that the government must answer this (and six other)

questions "regarding Export Buyer's Credits provided to **all U.S. customers** of the respondent

(including all responding cross-owned affiliated companies) during the POR."  *Id.* at 186

(emphasis in original).  The instructions repeated this limitation, requesting the information

"regarding all buyer credits provided to the respon[d]ent's customers."  *Id.*  (emphasis in

original).  The Chinese government responded, "Not applicable.  Yama confirms none of its

customers have used this program.  Please refer to Yama's response."  China NSA Response,

J.App. at 219.  Because the record as a whole does not support a finding that Yama's customers

used the program, the response of the Chinese government cannot be shown to be incorrect, and the Department's finding of noncooperation by the Chinese government is also unsupported as to the request for information on third-party banks as presented in the first NSA questionnaire.

In its supplemental NSA questionnaire, Commerce again requested that the Chinese government "[p]rovide a list of all partner/correspondent banks involved in disbursement of funds under the Export Buyer's Credit Program." Supplemental NSA Questionnaire to China, J.App. at 246. The Chinese government's response was that "Export-Import (EXIM) Bank of the PRC is the only bank which is involved in the Export Buyer's Credits Program." China Supplemental NSA Response, J.App. at 272. This response reasonably can be read as responding specifically to the question that Commerce asked, i.e., what banks were involved in disbursement of EBCP funds, and referring to the government entity that administers the program. It was impermissible on this record for Commerce to state a finding that the government of China had failed to provide requested information regarding "the use of third-party banks to . . . *settle* export buyer's credits." Final Decision Mem., J.App. at 30 (emphasis added). Commerce never asked the government of China for information on the participation of third-party banks in the "settlement" of EBCP credits. Having chosen not to make this inquiry, Commerce could not permissibly base any findings in the Final Results on the false premise that it had.

What is more, the record contained information on the procedures followed by the EX-IM Bank. The response of the Chinese government to the supplemental NSA questionnaire provided such information, and additional information on the process is contained in the questionnaire response of the government of China in the proceeding on certain amorphous

silica fabric, which Commerce itself placed on the record.  *See* China Supplemental NSA

Response, J.App. at 270-72; China Silica Fabric Response, J.App. at 524-29.  The latter

discusses the possible role of banks other than the EX-IM Bank in the overall process of

settlement of funds, but it is consistent with the response that the EX-IM Bank is the only entity

that performs the disbursement.

On the record considered on the whole, Commerce was not free to ignore the evidence

the government of China, after obtaining from the EX-IM Bank the search results on Yama's

customers, provided.  This evidence consisted of the government's statements that at the EX-IM

Bank "none of the customers had balances for export buyer's credits during the POR" and that,

therefore, "GOC confirms this program was not used by these customers during the POR."

China Supplemental NSA Response, J.App. at 272.  Nor was Commerce free to ignore the

evidence consisting of Yama's statements that it contacted all its export customers, which it

identified in its questionnaire response, "and confirmed no customers had obtained buyers'

credit from China Ex-Im Bank in the POR."  Yama NSA Response, J.App. at 234.  Defendant-

intervenor argues that Yama should have obtained certifications of non-use from each of its

customers, Def.-Int.'s Br. 13, but the absence of such certifications is not a justification

allowing Commerce to ignore the record evidence that existed.  There is no basis in the record

upon which it reasonably could be presumed or speculated—as Commerce apparently did—that

a Yama customer could have obtained or participated in a loan under the Export Buyer's Credit

Program about which both (1) the EX-IM Bank had no record and (2) Yama and the customer

itself were unaware.

5. Defendant Relies on Inapposite Judicial Decisions in Advocating that the Final Results Must
Be Sustained

Defendant relies on *KYD, Inc. v. United States*, 607 F.3d 760, 768 (Fed. Cir. 2010) for

the proposition that "Commerce may apply an adverse inference, based upon the Chinese

government's failure to provide requested information in a countervailing duty proceeding, even

when the respondent cooperates." Def.'s Br. 10.  This reliance is erroneous in two respects.

*KYD* involved an antidumping duty, not a countervailing duty, proceeding.  *See KYD*, 607 F.3d

at 761-62.  Countervailing duty proceedings involve different considerations because the

exporting country's government is often in the best position to provide information necessary to

the Department's determination.  *KYD* is also distinguishable in that the cooperating party was a

U.S. importer and the noncooperating party was the exporter of the merchandise.  As the Court

of Appeals recognized, plaintiff KYD, Inc., as an importer unaffiliated with the noncooperating

exporter, was not entitled by statute or regulation to its own assessment rate.  *KYD*, 607 F.3d at

768.  In short, *KYD* has nothing to do with this case.

Defendant also relies on *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365,

1373 (Fed. Cir. 2014) ("*Fine Furniture*") for the principle that "cooperating respondents may be

subject to collateral effects due to the adverse inferences applied when a government fails to

respond to Commerce's questions."  Def.'s Br. 10 (quoting *Fine Furniture*, 748 F.3d at 1373).

*Fine Furniture* is distinguishable from this case in that in *Fine Furniture* "Commerce did not

apply adverse inferences to substitute for any information that was actually submitted by the

cooperating respondents."  *Fine Furniture*, 748 F.3d at 1372.  Substituting an adverse inference

for information supporting a finding of non-use of the EBCP, as provided by Yama and the government of China, is precisely what Commerce did in the instant review.

### III. CONCLUSION AND ORDER

Commerce erred in promising, and then failing, to allow Yama a meaningful opportunity to demonstrate that it did not benefit from the EBCP. It erred, specifically, when it ignored the considerable evidence Yama and the government of China provided indicating that Yama had not in fact benefitted from the program and when it overlooked that there was a complete lack of evidence that Yama had obtained a benefit. Commerce also erred in finding that, due to the failure of the Chinese government to respond to three identified categories of information requests, the record information did not allow Commerce to determine whether Yama benefitted from the program. That finding lacked the support of substantial evidence on the record of the review. Accordingly, the record did not contain evidence sufficient to support the Department's determination to impute to Yama a benefit from the EBCP using facts otherwise available or an adverse interference. On remand, Commerce now must make the "benefit" determination the statute required it to make as to the EBCP, it must do so without resort to facts otherwise available or an adverse inference, and it must redetermine Yama's overall subsidy rate in accordance with that finding.

Because there is only one correction to be made in the Final Results upon remand, the court is allowing a period of only 60 days in which the Department must submit its new determination. Due to the limited nature of the correction to be made, the court does not anticipate the need to grant an extension of this time period and will do so only in the most extraordinary circumstances.

Court No. 18-00054                                                              **Page 28**

For all the reasons stated above, the court remands the Final Results to Commerce for

correction according to this Opinion and Order.  Therefore, upon consideration of all papers and

proceedings had herein, and upon due deliberation, it is hereby

**ORDERED** that the Motion for Judgment on the Agency Record of Plaintiff Yama
Ribbons and Bows Co. (July 30, 2018), ECF No. 23, be, and hereby is, granted; and it is further

**ORDERED** that Commerce shall correct its errors concerning the Export Buyer's
Credit Program and submit a new determination upon remand ("Remand Redetermination") that
complies fully with this Opinion and Order; it is further

**ORDERED** that Commerce will submit its Remand Redetermination within 60 days of
the date of this Opinion and Order; it is further

**ORDERED** that any comments by plaintiff Yama Ribbons and Bows Co. and
defendant-intervenor Berwick Offray LLC on the Remand Redetermination must be filed with
the court no later than 30 days after the filing of the Remand Redetermination; and it is further

**ORDERED** that any response of defendant to the aforementioned comments must be
filed no later than 15 days from the date on which the last comment is filed.

                                                            /s/ Timothy C. Stanceu
                                                            Timothy C. Stanceu, Chief Judge

Dated: December 30, 2019
           New York, New York